THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

GLEN A. HOOKS,

               Plaintiff,

     v.

WARDEN PAUL SCHULTZ, et al.,

               Respondent.

HONORABLE JEROME B. SIMANDLE

Civil No. 07-5627 (JBS)

**OPINION**

APPEARANCES:

Mr. Glen A. Hooks
1727 Gales Place, N.E.
Washington, DC 20002
    Plaintiff appearing <u>pro</u> <u>se</u>

Ralph J. Marra, Jr.
Acting United States Attorney
By:  Paul A. Blaine
    Assistant United States Attorney
U.S. ATTORNEY'S OFFICE
401 Market Street, 4th Floor
Camden, New Jersey 08101
    Attorneys for the defendants

**SIMANDLE**, District Judge:

This case arises from an assault upon Plaintiff, Glen A. Hooks ("Plaintiff"), on January 10, 2007, at the Federal Correctional Institution in Fairton, New Jersey ("FCI Fairton"), at the hands of a fellow inmate[1] who had been diagnosed as delusional and assaultive, hearing voices commanding him to hurt others.  The present motions raise issues concerning the duty to

---

    [1] The Court will not use the other inmate's name for the sake of medical and mental health privacy.  He will be referred to as the "other inmate" or "assailant."

protect an inmate from a substantial risk of assault by a fellow inmate.

This matter comes before the Court on the motion to dismiss, or in the alternative, summary judgment submitted by Defendants in this matter, seven officials at FCI Fairton [Docket Item No. 28]. Plaintiff, appearing pro se, has brought suit against Defendants Paul Schultz, the Warden of FCI Fairton; Karl Belfonti, an Associate Warden; Michael Ward, Captain; Douglas McPhail, Administrator of Food Service; Michael Howard, Assistant Administrator of Food Service; Julie Smith, Psy.D., Chief Psychologist; and R. B. Morales, M.D., Clinical Director of the Health Services Unit (collectively, "Defendants"). Plaintiff was an inmate at FCI Fairton, during the relevant time in this suit and was released from Federal Bureau of Prisons ("BOP") custody on May 4, 2008. Plaintiff alleges that Defendants, with the exception of Dr. Morales, failed in various ways to protect him from an assault by another inmate that took place on January 10, 2007, in the Food Service area of the institution where Plaintiff and another inmate were then assigned to work details. Plaintiff's claims are premised on theories of deprivation of constitutional rights under the Eighth Amendment pursuant to Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and vicarious liability.

2

Specifically, Plaintiff avers that (1) Warden Schultz should have separated the assailant inmate based on his medical records and institutional history; (2) Associate Warden Belfonti failed to properly exercise supervisory oversight of staff at the institution; (3) Captain Ward failed to place additional surveillance cameras in the Food Service area; (4) Administrator of Food Service McPhail did not properly screen the medical/mental status of inmates for Food Service work positions; (5) Assistant Administrator of Food Service Howard failed to report unusual work performance of inmates and staff; (6) Chief Psychologist Smith failed to respond to "any" memoranda submitted to the "Mental Health Service" before or after Plaintiff was attacked; and (7) Clinical Director of the Health Services Unit Morales improperly denied Plaintiff a CT scan after the assault.

The Court, for the reasons set forth below, grants Defendants' summary judgement regarding Defendants Ward, Howard, Smith and Morales without prejudice and Defendant Belfonti with prejudice.  Defendants' motion for summary judgement with regards to Defendants Schultz and McPhail is denied.

I.   **BACKGROUND**

   **A.   Facts**[2]

---

   [2]   The government has requested that certain documents and information contained in the BOP records and files of the assailant inmate not be disclosed to Plaintiff and not be made public record due to the confidential and sensitive nature of the materials.  The materials include the assailant inmate's BOP work

During the relevant period, Plaintiff was incarcerated at FCI Fairton where he was assigned work duties at the institution's Food Service Department.  On January 10, 2007, Plaintiff was observed by Defendant Ward, Defendant McPhail, Food Service Administrative Assistant Shelly Bombardi, and Cook Supervisor Fields bleeding from his head area.  (Defs. Stmt. of Material Facts, at 3-4).  Plaintiff initially stated that he had fallen down and did not remember what had happened.  Id.  Subsequently, FCI Fairton personnel conducted a search of the Food Service inmate bathroom and found an inmate's shirt with blood stains on it.  Id.  Inside the shirt was an identification card of another inmate, and the other inmate was later interviewed.  Id. at 4-5.  Defendant Morales, the Clinical Director, examined Plaintiff and conducted an Inmate Injury Assessment.  Id.

The Inmate Injury Assessment and Followup report shows that Plaintiff suffered a large deep laceration on the left side of his forehead and a swollen left upper cheek.  (Complaint, Exh. B).  Plaintiff received minor first aid, stitches and had an x-ray performed, which did not show any fractures.  Id.

---

history, disciplinary, and clinical psychology records. Plaintiff has received a redacted version of the record. Accordingly, the stated facts are principally derived from materials provided by Defendants.  Further, to the extent that Plaintiff does not offer facts in support of his arguments, it is noted that this is due primarily to his lack of access to the aforementioned materials.

Special Investigations Agent Byrnes then interviewed Plaintiff and he was able to identify his inmate assailant through a photograph.  (Defs. Stmt. of Material Facts, at 5-6). Plaintiff recounted that there had been a minor verbal altercation with the other inmate, but did not know the name of the other inmate.  Id.  Subsequent to the verbal exchange between the inmates, Plaintiff did not recall what happened afterwards. Id.  On January 20, 2007, Plaintiff provided to Operations Lieutenant Nathaniel Bullock a detailed letter regarding the incident of January 10, 2007.  Id. at 6-7.  In this letter, Plaintiff details that he exchanged some words with the other inmate about cups in the Food Service department and states that he ignored the other inmate and returned to the kitchen area. Id.  However, after this point Plaintiff only generally recalls being hit in the head.

A review of the other inmate's BOP record shows the following, he (1) was designated to FCI Fairton on February 6, 2006; (2) resided in the general population for over eleven consecutive months, February 7, 2006, until the incident on January 10, 2007; (3) worked at the Food Service Department for almost ten consecutive months; and (4) prior to the incident, had incurred five disciplinary violations, the most recent being December 2, 2004 - all violations occurred at a different institution.  (Declr. J. Smith, Psy.D., at 3-10; Declr. V.

Herbin-Smith, document 1h, at 2-3).  Violations occurring prior
to January 10, 2007 include one incident of assault on a social
worker without serious injury, one incident of threatening bodily
harm, one incident of fighting with another person, and two
incidents of indecent exposure.  (Declr. V. Herbin-Smith,
document 1g, at 2-3).

Turning to the other inmate's psychological record, the
record shows that he suffered from a mental health history of
depression, hearing voices, and schizophrenia.  The inmate
maintained an ongoing prescription for Abilify, a psychotropic
medication, at all relevant times, which controlled the inmate's
schizophrenia.  The inmate was first transferred to FCI Fairton
for the purpose of participating in the Residential Drug Abuse
Treatment Program (RDAP) on February 6, 2006.  Upon his
admission, the FCI Fairton Drug Abuse Program Coordinator noted
that his admission documentation reflected a Psych Alert Code
indicating that he had a history of mental health issues.  (Decl.
of J. Smith, Psy.D., document 1, Memorandum of B. Flaxington,
dated February 6, 2006).  On February 7, 2006, a Staff
Psychologist interviewed the inmate and reported that the inmate
had previously been diagnosed with Schizophrenia, which was
successfully managed by the Abilify prescription.  The inmate
further denied any suicidal ideations or intent, verbally
acknowledged that he would not attempt to hurt himself, and was

6

cleared for release into the general population.  (Decl. of J. Smith, Psy.D., document 1, Memorandum of C. Dennery, dated February 7, 2006).  On February 8, 2006, a Staff Psychologist conducted a Mental Status Assessment.  The assessment found no evidence of any positive or negative symptoms consistent with past diagnoses of Schizophrenia.  (Decl. of J. Smith, Psy.D., document 1, Memorandum of C. Dennery, dated February 8, 2006).  A records review by a Staff Psychologist revealed that the inmate was formally diagnosed with schizophrenia and that he

> [h]as a known history of rapid deterioration when off of his psych meds, and . . . [h]as been observed to experience increased paranoia and fighting[, especially in the Special Housing Unit,] as well as episodes of significant disorientation and complete absences in memory.

(Decl. of J. Smith, Psy.D., document 1, Memorandum of C. Dennery, dated February 8, 2006).  Without proper treatment, the inmate suffers from "command auditory hallucinations" that have told him to "harm others." (Decl. of J. Smith, Psy.D., document 1, Memorandum of C. Dennery, dated May 23, 2006).  On February 10, 2006, a psychological intake screening was performed where Chief Psychologist J. Smith determined that due to his history of psychological difficulties he should be monitored monthly via the Medical Duty Status (MDS) and that his medication regimen would be monitored through routine referrals to the psychiatry clinic. (Decl. of J. Smith, Psy.D., document 1, Memorandum of J. Smith, dated February 10, 2006).  The inmate experienced relative mental

stability and compliance with his medication regimen, and so the
Staff Psychologist removed the MDS assignment on November 7,
2006.  (Decl. of J. Smith, Psy.D., document 1, Memorandum of C.
Dennery, dated November 7, 2006).

    The record indicates that the inmate began to deviate from
his state of relative stability beginning November 27, 2006.  On
November 27, 2006, the Staff Psychologist indicated that he was
contacted by the Food Service Supervisor regarding the inmate
because the inmate expressed a refusal to work.  (Decl. of J.
Smith, Psy.D., document 1, Memorandum of C. Dennery, dated
February 27, 2006)  At this time, the inmate (1) maintained
compliance with his medications, (2) reported no evidence of
distorted cognition/psychosis, (3) denied having encountered any
difficulties working with others, and (4) denied feeling
suicidal.  On December 18, 2006, the inmate met again with the
Staff Psychologist for a follow-up evaluation.  (Decl. of J.
Smith, Psy.D., document 1, Memorandum of C. Dennery, dated
December 18, 2006).  The Staff Psychologist noted that the inmate
had only sporadically been following his medication regimen, but
did not formally refuse medication and agreed to resume full
medication compliance.  Further, the inmate expressed a desire to
be assigned to a different work detail in Food Service.  Id.

    On January 3, 2007, Julie Smith, Psy.D., Chief Psychologist
at FCI Fairton, received an email from the Assistant Food

Services Administrator, who had concerns regarding the inmate's behavior.  (Decl. of J. Smith, Psy.D., document 1, Memorandum of J. Smith, dated January 3, 2007) The Assistant Food Services Administrator described the inmate as "lacking social skills," and "sitting for long periods and staring."  In response to this information, the Chief Psychologist notified the Staff Psychologist working most closely with the inmate and made plans to further assess the inmate's mental status.  Id.

On January 4, 2007, the Staff Psychologist contacted the Pharmacy for an update on the inmate's medication compliance patterns.  (Decl. of J. Smith, Psy.D., document 1, Memorandum of C. Dennery, dated January 4, 2007).  The Staff Psychologist determined that since the December 18, 2006 follow-up evaluation, the inmate (1) had reported to the Pharmacy only 8 of 17 times to receive his medication of Abilify, (2) missed callouts over three consecutive weeks to have his blood sugar checked, and (3) was at high risk of having his medication discontinued because of the staff's inability to monitor his blood for common side effects on a routine basis.  Id.

Later on January 4, 2007, the Staff Psychologist conducted a functional assessment with the inmate.  Id.  The inmate stated that (1) he did not feel that he needed to take medications, (2) denied any mood, thought or psychotic symptoms, and (3) claimed to be doing well.  The psychologist advised the inmate that he

would be placed on more frequent callouts to monitor his
progress.  Id.  The inmate was not placed on MDS, but the
psychologist indicated he would monitor the inmate on a monthly
basis in order to determine his functioning off of the
medication.  Further, the Staff Psychologist reported:

> While he continued to do well for quite some time, he was
> still seen occasionally, but twice over the past month
> his work detail supervisors contacted Pysch Svcs to
> report concerns.  Ms. Lombardi in FS advised me that the
> first of these incidents was quickly resolved, but I and
> other staff have noted recent changes in effect and
> attention.  Whereas he was experiencing a bright affect
> and clear cognition, he has presented recently and today
> with a more dull, restricted affect, with occasional
> requests to have a simple line of inquiry repeated.

Id.  This was the last contact that the inmate had with
Psychology staff prior to the assault on the Plaintiff.

**B.   Procedural History**

On November 26, 2007, Plaintiff filed his complaint in this
matter, along with several exhibits detailing the January 10,
2007 assault against him and requests he had made to FCI Fairton
officials.  In that complaint Plaintiff alleged that Defendants'
conduct violated Plaintiff's Eight Amendment right to be free
from cruel and unusual punishment.  On June 3, 2008, Defendants
filed the instant motion for dismissal and, in the alternative,
summary judgment.  Defendants' motion included declarations from
(1) the Legal Liaison for FCI Fairton, and records maintained in
the ordinary course of business regarding the assault against

Plaintiff; (2) the Special Investigative Agent at FCI Fairton, and handwritten interview notes of Plaintiff and assailant; (3) a Supervisory Paralegal responsible for overseeing the Administrative Remedy Process, and records of Plaintiff's administrative remedies; and (4) the Chief Psychologist at FCI Fairton regarding events pertaining to the psychiatric treatment of the assailant inmate at FCI Fairton and BOP policy regarding psychological services and the inmate work program.  On August 7, August 11, and November 5, 2008, Plaintiff submitted oppositions to Defendants' motion.  Defendants' filed their reply on August 20, 2008.  Because Defendants filed their motion in lieu of an answer to Plaintiff's complaint, it appears that significant discovery has not proceeded.

In their brief for motion to dismiss or summary judgment, Defendants argue that Plaintiff has failed to exhaust his administrative remedies for all his claims except his allegation that the inmate who assaulted him should not have been cleared for a work assignment in the Food Services Department. Defendants further argue that Plaintiff, to the extent that he is attempting to proceed against Defendants on a theory of negligence, has failed to name the proper party under the Federal Tort Claims Act and that officials at FCI Fairton had no reason to believe that Plaintiff or any other inmate was at risk of being assaulted by the inmate who attacked Plaintiff.

11

## II.   DISCUSSION

### A.   Standard of Review

Though Defendants present their motion as a motion to dismiss under Rule 12(b)(6), and only in the alternative as a motion for summary judgment, the Court will construe the motion to be one seeking summary judgment.  Defendants repeatedly argue that Plaintiff, who the Court has already noted is proceeding pro se, has failed to "establish" certain facts in dispute, such as whether there was a substantial risk of assault by his assailant. (Def. Br. at 5 n.1).  These arguments are not appropriate in a motion to dismiss.  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (actual proof is not a question for Rule 12(b)(6) motion).  Further, Defendants submit, and reference in their various arguments, substantial documentary evidence well beyond the complaint and matters of public record.  Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007) ("Generally, in ruling on a motion to dismiss, a district court relies on the complaint, attached exhibits, and matters of public record.").  Because the Court finds sufficient undisputed facts in the record on certain issues to permit resolution of this motion as one for summary judgment, the Court will proceed within that framework, while finding that summary judgment is premature with respect to other issues where discovery is warranted, as discussed below.

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

**B.   Administrative Exhaustion**

Defendants argue that Plaintiff has not exhausted the administrative remedies established by the BOP, set forth in 28 C.F.R. Part 542, and required by the Prison Litigation Reform Act ("PLRA"), for his claims related to the following allegations: (1) Defendant Ward failed to have additional surveillance cameras installed in the Food Service Department; (2) Defendant Howard

13

failed to report unusual work performances; (3) Defendant Smith failed to respond to memoranda which were sent to the Mental Health Department before and after the assault; and (4) Defendant Morales improperly denied adequate medical attention and/or a CT scan for his head injuries sustained in the assault of January 10, 2007.  Plaintiff responds by asserting in his opposition that he exhausted all administrative remedies in a timely and proper fashion without offering additional evidence.  The Court agrees with Defendants and finds that Plaintiff has presented no evidence to suggest that he exhausted the administrative remedies available to him and so will dismiss those claims without prejudice to a later complaint based on properly exhausted claims.

The PLRA provides in relevant part that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correction facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "As the statutory language makes clear, § 1997e(a) applies equally to § 1983 actions and to <u>Bivens</u> actions."  <u>Nyhuis v. Reno</u>, 204 F.3d 65, 68 (3d Cir. 2000).  The PLRA's exhaustion requirement applies to all inmate suits "about prison life, whether they involve general circumstances or particular episodes, whether they allege excessive force or some

other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002).  Under the Act, the exhaustion of all administrative remedies is mandatory, whether or not the inmate believes that such administrative remedies would be effective and even if the available administrative remedy process cannot grant the desired remedy.  <u>Booth v. Churner</u>, 532 U.S. 731, 739-41 (2001). Enforcement of the PLRA's exhaustion requirement serves the twin goals of "protect[ing] administrative agency authority . . . . [and] promot[ing] efficiency."  <u>Woodford v. Ngo</u>, 548 U.S. 81, 88 (2006).  The PLRA's exhaustion requirement furthers these goals by providing the "prisoner who does not want to participate in the prison grievance system" with the "incentive to comply with the system's procedural rules."  <u>Id</u>. at 2388.

As the Court of Appeals has recognized, because there "is no express federal law describing the procedural requirements with which prisoners must comply in satisfying § 1997e(a)'s exhaustion requirement," the procedures set out in a prison's administrative grievance program serve as the measure for whether an inmate has exhausted his administrative remedies.  <u>Spruill v. Gillis</u>, 372 F.3d 218, 231 (3d Cir. 2004).  In the case of federal prisoners, the BOP's regulations define the process that a federal inmate must use in "seek[ing] formal review of an issue relating to any aspect of his/her own confinement."  28 C.F.R. § 542.10(a).  The grievance process that a federal prisoner must exhaust prior to

15

filing suit is a multi-stage process, and a prisoner must proceed through each stage in order to satisfy the PLRA's pre-suit exhaustion requirement.  See Ghana v. Holland, 226 F.3d 175, 178 (3d Cir. 2000).

In brief, the BOP's administrative grievance process requires a prisoner to file an informal complaint with prison staff, to appeal an adverse decision to the prison warden, to appeal from the warden's determination to the BOP's Regional Director, and finally, to appeal from the Regional Director's decision to the BOP's General Counsel.  See id.; see also 28 C.F.R. §§ 542.10, et seq.

In this case, the PLRA exhaustion requirement most certainly applies, for Plaintiff brings suit about both the general conditions of his prison life as well as the circumstances surrounding a particular incident.  See Porter, 534 U.S. at 532. It is similarly evident from the record that Plaintiff did not file or seek any remedy with respect to the following allegations: (1) Defendant Smith failed to respond to memoranda which were sent to the Mental Health Department before and after the assault; (2) Defendant Howard failed to report unusual work performances; (3) Defendant Ward failed to have additional surveillance cameras installed in the Food Service Department; and (4) Defendant Morales improperly denied adequate medical attention and/or a CT scan for his head injuries sustained in the

16

assault of January 10, 2007.  Although the Plaintiff is not
required to "specially plead or demonstrate exhaustion in [his]
complaint," Plaintiff has not refuted or provided any
declarations or evidence stating that he both initiated and
completed the administrative remedy procedure with regards to
these claims.  Jones v. Bock, 549 U.S. 199, 217 (2007).
Accordingly, Plaintiff cannot create a genuine issue as to the
question of exhaustion.[3]  See Premises Known as 717, 2 F.3d at
533.  The Court must grant summary judgement in favor of
Defendants on Plaintiff's claims related to above four claims for
failure to exhaust.

The entry of summary judgement is without prejudice to
Plaintiff's right to file a new complaint upon his exhaustion of
available administrative remedies.

### C.    Remaining Claims - Individual Versus Official Capacity

In turning to Defendants' remaining arguments against
Plaintiff's claims that (1) Warden Schultz should have separated
the attacking inmate based on his medical records and
institutional history, (2) Associate Warden Belfonti failed to
properly exercise supervisory oversight of staff at FCI Fairton,
and (3) Administrator of Food Services McPhail did not properly

---

[3] Any administrative remedy sought after Plaintiff filed his
complaint does not provide any benefit for the purposes of this
action.  See Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)
("Before filing suit, prisoners must exhaust their available
administrative remedies.").

screen the medical/mental status of inmates for Food Services work positions, the Court must first determine whether Plaintiff's claims against the Defendants are brought against them in their official capacity only or also in their individual capacity.

As this Court has previously noted, Bivens actions are simply the federal counterpart to § 1983 actions brought against state officials who violate federal constitutional or statutory rights. Egervary v. Young, 366 F.3d 238, 246 (3d Cir. 2004), cert. denied, 543 U.S. 1049 (2005) (citing Brown v. Philip Morris, Inc., 250 F.3d 789, 800 (3d Cir. 2001); Bowser v. Blair County Children and Youth Svcs., 346 F.Supp.2d 788, 797 (W.D.Pa. 2004). "[C]ourts have generally relied upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a Bivens claim against federal officials." Schrob v. Catterson, 948 F.2d 1402, 1409 (3d Cir. 1991). The Third Circuit is among a majority of federal circuit courts which employ a 'course of proceedings' test to determine whether a plaintiff in a § 1983 action may proceed with both an official and individual capacity suit when it is unclear what his intentions are from the complaint. Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990).

> Under the 'course of proceedings' test, courts are not
> limited by the presence or absence of language
> identifying capacity to sue on the face of the complaint
> alone. Rather, courts may examine the 'substance of the

18

> pleadings and the course of proceedings in order to determine whether the suit is for individual or official liability.'" <u>Pride v. Does</u>, 997 F.2d 712, 715 (10th Cir. 1993).  Relevant factors under such an analysis include "the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity." <u>Moore v. City of Harriman</u>, 272 F.3d 769, 772 n. 1 (6th Cir. 1995). The "underlying inquiry remains whether the plaintiffs intention to hold a defendant personally liable can be ascertained fairly." <u>Biggs v. Meadows</u>, 66 F.3d 56, 61 (4th Cir. 1995).

<u>Ali v. Howard</u>, No. 05-102-SLR-LPS, 2008 WL 4427209, at *4 (D.Del. Sept. 30, 2008) (applying test to <u>pro se</u> Plaintiff in suit against Delaware Department of Correction officials where Plaintiff did not indicate whether defendants were to be sued in their individual or official capacities).

Plaintiff's Complaint lists the individual defendants' names with their job titles, and generally describes their governmental positions.  It appears that Plaintiff intended to name the Defendants personally as well as in their official capacity.  This conclusion is further supported by (1) Plaintiff seeks punitive damages from those defendants, which are unavailable when proceeding against an official only in an official capacity; and (2) the Defendants have asserted qualified immunity.  This Court will grant the <u>pro se</u> Plaintiff the benefit of the doubt and will analyze the claims as if they are brought against the Defendants in both their individual and official

capacities.  See Estelle v. Gamble, 429 U.S. 97, 106 (1976) (pro se pleadings are reviewed with liberality).

### D.   Remaining Claims - Official Capacity

With regards to the Defendants being sued in their official capacities, the United States has sovereign immunity except where it consents to be sued.  United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).  Without such a waiver of immunity, the Plaintiff cannot proceed in an action for damages against the United States or an agency of the federal government for alleged deprivation of a constitutional right, or against any of the individual defendants in their official capacities.  Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099 (1985).  Therefore, Plaintiff's Bivens claim asserting a violation of the Eighth Amendment is dismissed in its entirety against the BOP.

### E.   Remaining Claims - Individual Capacity

#### 1.   Respondeat Superior

With regards to Defendants Schultz and Belfonti, Defendants, in their brief, assert that neither Defendants Schultz or Belfonti "ought to have understood that his or her alleged individual actions or inactions would violate the Constitution." (Defs. Br. at 16).  Defendants further assert that Plaintiff "alleges only that their involvement in this case stems from their supervisory capacities at FCI Fairton.  Specifically,

20

[Plaintiff] contends that as the Warden and Associate Warden, Schultz and Belfonti failed to supervise staff who were in positions to screen and protect him from predatory inmates." (<u>Id</u>.)  Defendants conclude that <u>respondeat</u> <u>superior</u> cannot serve as the basis of personal liability for a civil rights action. This Court agrees.

The Third Circuit has indicated that "<u>respondeat</u> <u>superior</u> is not an available relief under <u>Bivens</u>."  <u>Huberty v. U.S.</u> <u>Ambassador to Costa Rica</u>, No. 07-4330, 2008 WL 3864073, at *1 (3d Cir. Aug. 21, 2008) (citing <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000) (collecting cases holding that <u>respondeat</u> <u>superior</u> is not a viable theory under <u>Bivens</u>); <u>Rode v.</u> <u>Dellarciprete</u>, 845 F.2d 1195, 1207-08 (3d Cir. 1988) (no <u>respondeat</u> <u>superior</u> liability in § 1983 cases); <u>see</u> <u>Young v.</u> <u>Quinlan</u>, 960 F.2d 351, 358 n. 14 (3d Cir. 1992) (noting "[m]ost jurisdictions have decided against the applicability of <u>respondeat</u> <u>superior</u> in <u>Bivens</u> suits); <u>Jones v. Miner</u>, No. 06-1606, 2007 WL 2212508, at *4 (D.N.J. July 27, 2007) (stating that through non-precedential opinions, the Third Circuit has indicated that "liability under <u>Bivens</u> . . . may not [be] based on the doctrine of <u>respondeat</u> <u>superior</u>") (citing <u>Parker v. United</u> <u>States</u>, 197 Fed. Appx. 171, 172 n. 1 (3d Cir. 2006); <u>Richards v.</u> <u>Penn.</u>, 196 Fed. Appx. 82, 85 (3d Cir. 2006); <u>Balter v. United</u> <u>States</u>, 172 Fed. Appx. 401, 403 (3d Cir. 2006)).  Liability may

not be imposed under § 1983 on the traditional standard of
respondeat superior.  Rode, 845 F.2d at 1207-08.  Thus,
"supervisory personnel are only liable for the § 1983 violations
of their subordinates if they knew of, participated in or
acquiesced in such conduct."  Capone v. Marinelli, 868 F.2d 102,
106, at n. 7 (3d. Cir. 1989) (citation omitted).

    The evidence received in this motion fails to show the
necessary nexus between Plantiff's injury and Defendant
Belfonti's alleged actions.  Plaintiff argues, in his Complaint,
that Defendant Belfonti "failed to oversee Food Service staff and
the conditions they had inmates working under."  (Complaint, at
5).  Plaintiff's claim is based solely on Defendant Belfonti's
position as the Associate Warden of FCI Fairton.  Plaintiff
provides no allegations or facts in either his Complaint or
Response demonstrating that Defendant Belfonti had any knowledge
of, participation in, or acquiescence to the circumstances that
resulted in the assault against Plaintiff on January 10, 2007.
In fact, the record is devoid of such evidence.  This Court will
follow the great weight of authority supporting the proposition
that Bivens liability will not lie on the basis of respondeat
superior.

    With regards to Defendant Schultz, however, Plaintiff has
alleged that the Warden should "have separated [the] assailant on
[the] basis of past medical records and institutional history."

22

(Compl. at 5.)  As such, Plaintiff has alleged that Defendant Schultz knew of the danger posed by the inmate who assaulted him, and made the decision not to separate a dangerous inmate from the general population.  These allegations are not of supervisor liability, but of personal liability.  The Court recognizes that Plaintiff has not personally offered direct evidence of the Warden's knowledge and action or acquiescence, but Plaintiff has proceeded without the assistance of counsel and without the benefit of significant discovery (in fact, receiving only redacted versions of Defendants' evidence) and the Court will not grant summary judgment on this issue at this stage.  Miller v. Beneficial Mgmt. Corp., 977 F.2d 834, 845 (3d Cir. 1992) (noting that summary judgment is particularly inappropriate where the relevant "facts are in possession of the moving party").  Further, the record that the Court does have shows the assaulting inmate's history of violence and psychological problems were well documented and known to many FCI Fairton officials, including departmental heads, such that a jury could find that the Warden, at the very least, must have been aware of this particular inmate's assaultive tendencies and delusional states.

## 2.   Qualified Immunity

The Court will now turn to the remaining issue of whether qualified immunity applies to Warden Schultz's failure to separate an allegedly dangerous inmate and Administrator of Food

Services McPhail's alleged improper screening of the medical/mental status of inmates for Food Services work positions.  The inquiry begins with the argument that the Defendant is protected by qualified immunity.  See Hubbard v. Taylor, 399 F.3d 150, 167 (3d Cir. 2005).

As an "accommodation of competing values," qualified immunity strikes a balance by permitting a plaintiff to recover for constitutional violations where the defendant officer was "plainly incompetent or . . . knowingly violate[d] the law," while immunizing an officer who "made a reasonable mistake about the legal constraints on his actions."  Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court described the two-step inquiry courts undertake in determining whether a governmental officer is entitled to qualified immunity.  First, the Court must address whether "the officer's conduct violated a constitutional right."  Id. at 201. As the Court of Appeals noted in Curley, the first step of the analysis is "not a question of immunity at all, but is instead the underlying question of whether there is even a wrong to be addressed in an analysis of immunity."  Curley, 499 F.3d at 207. If in this first step the Court finds that there was no constitutional violation, "there is no necessity for further

inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

"If, and only if, the court finds a violation of a constitutional right, the court moves to the second step of the analysis and asks whether immunity should nevertheless shield the officer from liability." Curley, 499 F.3d at 207 (quoting Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1774 (2007)). In the second step of the analysis, the Court addresses "whether the right that was violated was clearly established, or, in other words, 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier, 533 U.S. at 202).

In January 2009, the Supreme Court, in Pearson v. Callahan, 129 S.Ct. 808 (2000), restated the two-step Saucier inquiry and relaxed the carrying out of its protocol. The Court, in a unanimous opinion, ruled that "the Saucier protocol should not be regarded as mandatory in all cases." Pearson, 129 S.Ct. at 818. The Court further noted:

> When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim may be hard to identify. [citations omitted]. Accordingly, several courts have recognized that the two-step inquiry 'is an uncomfortable exercise where . . . the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed.

Id. at 819.  Stated differently, courts may, at their discretion,

begin with the second step of the inquiry.[4]

     In determining whether qualified immunity applies to

Defendants Schultz and McPhail, this Court will begin with the

first-step of the stated inquiry.  As the Third Circuit explained

in Hamilton v. Leavy,

> [t]he Eight Amendment's prohibition against cruel and
> unusual punishment protects prisoners against the
> "unnecessary and wanton infliction of pain."  Whitley v.
> Albers, 475 U.S. 312, 319 (1986) (internal quotation
> marks omitted).  This constitutional limitation on
> punishment has been interpreted to impose a duty upon
> prison officials to take reasonable measures "'to protect
> prisoners from violence at the hands of other
> prisoners.'"  Farmer v. Brennan, 511 U.S. 825 (1994).
> While "it is not . . . every injury suffered by one
> prisoner at the hands of another that translates into
> constitutional liability for prison officials responsible
> for a victim's safety," "being violently assaulted in
> prison is simply not 'part of the penalty that criminal
> offenders pay for their offenses against society.'"
> Farmer, 114 S. Ct. at 1977 (quoting Rhodes v. Chapman,
> 452 U.S. 337, 345 (1981)).  Accordingly, "[a] prison
> official's deliberate indifference to a substantial risk
> of serious harm to an inmate violates the Eighth
> Amendment."  Id. at 1974.

Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997) (citations

omitted).  The Supreme Court has dramatically described the

obligations of prison officials to protect their inmates:

> Having incarcerated "persons [with] demonstrated
> proclivit[ies] for antisocial criminal, and often

---

[4] "Although the Saucier rule prescribes the sequence in
which the issues must be discussed by a court in its opinion, the
rule does not--and obviously cannot--specify the sequence in
which judges reach their conclusions in their own internal
thought process."  Pearson, 129 S.Ct. at 820.

violent, conduct," Hudson v. Palmer, [468 U.S. 517, 526 (1984)], having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.  Cf. [DeShaney v. Winnebago County Dept. of Soc. Svcs., 489 U.S. 189, 199-200 (1989)]; Estelle, [ ] 429 U.S. at 103-04.  Prison conditions may be "restrictive and even harsh," Rhodes, [ ] 452 U.S. at 347, but gratuitously allowing the beating or rape of one prisoner by another serves no "legitimate penological objectiv[e]," Hudson v. Palmer, [ ] 469 U.S. at 548 (STEVENS, J., concurring in part and dissenting in part), any more than it squares with "'evolving standards of decency,'" Estelle, [ ] 429 U.S. at 102, (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)).

Farmer v. Brennan, 511 U.S. 825, 833-34 (1994).  However,

for an inmate to prevail on an Eighth Amendment failure-to-protect claim, two requirements must first be met. First, the prisoner must demonstrate "that he is incarcerated under conditions posing a substantial risk of serious harm." [Farmer v. Brennan, 511 U.S. at 834.] This element is satisfied when the alleged "punishment" is "objectively serious."  Id.  Second, the prison officials involved must have a sufficiently culpable state of mind.  [Id. at 838.] ("Our cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.").  Specifically, the inmate must show that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference."  Id.

Consequently, to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation.

Hamilton, 117 F.3d at 746 (citations omitted).

To establish deliberate indifference, a plaintiff must show that the individual was subjectively aware of the risk of harm to the plaintiff's health or safety, and disregarded it.  Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d. Cir. 2003).  "The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001).  Knowledge may be shown where the official has actual notice of the risk, Nami v. Fauver, 82 F.3d 63, 67-68 (3d Cir. 1996), or where the risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it."  Farmer, 511 U.S. at 842.  Thus, "a plaintiff [can] make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation . . . . [and] a prison official defendant cannot escape liability by showing that he did not know that *this* particular inmate was in danger of attack."  Beers-Capitol, 256 F.3d at 131 (citing Farmer, 511 U.S. at 843 ("it does not matter . . . whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face

such a risk")); see In re Bayside Prison Litigation, C.A. No. 97-
5127, 2007 WL 327519, at *5-6 (D.N.J Jan. 30, 2007) (finding that
assailed plaintiff had introduced sufficient evidence to allow a
factfinder to conclude that Supervisory Defendants were aware of
risk posed to all inmates of prison by prison officers); Myers v.
Schuylkill County Prison, C.A. No. 4:CV-04-1123, 2006 WL 559467,
at *7, (M.D.Pa. Mar. 7, 2006) (finding that although prison
official defendants did not have specific knowledge about the
specific injury and delay suffered by plaintiff in receiving
medical care, plaintiff raised a genuine issue of material fact
as to whether defendants "kn[ew] of and disregard[ed] an
excessive risk to inmate health or safety" caused by a shortage
of medical personnel at the prison") (quoting Farmer, 511 U.S. at
837).

> Officials need not have been certain that the particular
> harm would *actually* befall a prisoner: the standard looks
> to disregard of a known excessive *risk*. [Beers-Capitol,
> 256 F.3d at 131] On the other hand, our inquiry into the
> risk of harm itself, as distinct from the official's
> knowledge of it, is objective.  Id. at 132 (citing
> Farmer, 533 U.S. at [846].  For purposes of summary
> judgment, it is incumbent on the plaintiff to marshal
> evidence sufficient to raise the inference that a prison
> official "knowingly and unreasonably disregarded an
> objectively intolerable risk of harm." [Farmer, 533 U.S.
> at 846].

Counterman v. Warren Country Correctional Facility, 176 Fed.

Appx. 234, 238 (3d Cir. 2006) (emphasis original).

     The evidence shows when the assailant inmate arrived at FCI

Fairton he already had a record of violent incidents against

fellow inmates and prison staff.  Further, the Drug Abuse
Coordinator knew of the assailant's history of mental illness and
various staff psychologists recorded his tendency to rapidly
deteriorate and to hear command auditory hallucinations that told
him to hurt others.  On November 27, 2006, the Food Service
Supervisor reporting that the assailant inmate had expressed a
refusal to work.  Second, on January 3, 2007, Julie Smith,
Psy.D., Chief Psychologist at FCI Fairton, received an email from
an unspecified Assistant Food Service Administrator, who had
concerns regarding the inmate's mental status.  The email
described the inmate as "lacking social skills," and "sitting for
long periods and staring."  In response to this information, the
Chief Psychologist notified the Staff Psychologist working most
closely with the inmate and made plans to further assess the
inmate's mental status.  Nothing was done to remove the inmate
from close working quarters with other inmates.  Thus, there may
have been a known risk specific to individuals working with the
inmate in Food Services which was disregarded.

The evidence does not make clear whether it was Defendant
McPhail who contacted the psychiatric staff on the two occasions
noted.[5]  The record does show, however, that (1) the assailant

---

[5]  Defendants argue that Plaintiff has failed to demonstrate
that Defendant McPhail was responsible for screening inmates who
worked in Food Services.  (Def. Br. at 7).  The Court finds that
the role of Defendant McPhail as the Food Service Administrator
is an issue in genuine dispute and cannot be resolved at this

inmate had a history of rapid deterioration when non-compliant with his medications resulting in increased violent incidents, paranoia, fighting, significant disorientation, and complete memory loss; (2) the assailant inmate was not taking his prescription regularly; (3) staff was aware of his non-compliance; (4) a substantial change in disposition was noted by those working in Food Services; and (5) notifications were made to the psychiatric staff by Food Services expressing concern. Viewing the record evidence in the light most favorable to Plaintiff, a reasonable jury could find that Defendant McPhail knew of and disregarded a substantial risk of harm to Plaintiff and thus failed to protect him in violation of the Eighth Amendment.

Further, though, as the Court has already noted the record is sparse regarding Warden Schultz's role in this matter, the Court again emphasizes that Plaintiff is proceeding without discovery, without counsel, and with a redacted record. Plaintiff has alleged that Warden Schultz knew of the distinct risk, the evidence is certainly sufficient for a jury to conclude that the assailant inmate did present a significant risk to his co-workers in Food Services and that nothing was done about it, and because Plaintiff does not have access (via depositions or other discovery) to information needed to establish Warden

_____

stage.

Schultz's knowledge and role in this affair, the Court will not grant summary judgment on this issue at this stage.[6]

Having found that Plaintiff has adequately alleged that Defendants Schultz and McPhail violated his Eighth Amendment rights, the Court next "asks whether immunity should nevertheless shield the officer from liability." Curley, 499 F.3d at 207 (quoting Scott, 127 S.Ct. at 1774). Where, as here, the qualified immunity defense is raised in a motion for dismissal under Rule 12(b)(6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff," Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008), and assess "whether it would be clear to a reasonable officer that his conduct [as alleged in the

---

[6] "[B]y its very nature, the summary judgment process presupposes the existence of an adequate record." Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007). Rule 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). As the Supreme Court has explained, "Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (emphasis added). Therefore, "[i]f discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion." Abington Friends, 480 F.3d at 257; Miller, 977 F.2d at 845 ("[W]here the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.") (internal citations omitted).

Complaint] was unlawful in the situation he confronted."
Saucier, 533 U.S. at 201-02.

Accepting Plaintiff's allegations as true, the Court finds that it would have been clear to a reasonable officer that the actions Defendants Schultz and McPhail are alleged to have taken violated a "clearly established" constitutional right. Id. at 201. Since Farmer in 1994, it has been well-established that a prison official has a duty to protect prisoners from violence at the hands of other prisoners when a distinct heightened risk of harm is known. For the reasons stated, Defendant's motion to dismiss and, in the alternative, summary judgment with respect to the claim against Defendants McPhail and Schultz is denied.[7]

---

[7] The Court will not delve into the issues surrounding Defendants' arguments regarding a negligence theory against them based upon the Federal Tort Claims Act ("FTCA") because the Plaintiff has not named the proper defendant, the United States, as a party. The FTCA governs all claims against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment. 28 U.S.C. § 2675(a). In any FTCA claim, the only proper party defendant is the United States, and not the individually named employees of the BOP. See 28 U.S.C. § 2679(b) and (d)(1). "Thus, no individual employee of the BOP can be included in an FTCA action, and only the United States can be named as Defendants." Sash v. Hogsten, C.A. No. 1:CV-07-0475, 2008 WL 618945, at *9, n. 16 (M.D.Pa. Mar. 5, 2008). Any FTCA claim against the individual Defendants herein will be dismissed. If Plaintiff is able to assert that he filed a timely administrative tort claim, he may seek to amend his Complaint to assert an FTCA claim against the United States. To be "timely," an administrative tort claim must be presented in writing to the BOP within two (2) years of the accrual of such claim, and within six (6) months of any denial of the claim by the BOP. 28 U.S.C. § 3502(b).

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment with regards to Defendants Ward, Howard, Smith and Morales is granted without prejudice.  Defendants' motion for summary judgment with regards to Defendant Belfonti is granted with prejudice. Defendants' motion for summary judgment with regards to Defendants Schultz and McPhail shall be denied.  The accompanying Order will be granted.[8]


**March 19, 2009**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
U.S. District Judge

---

[8] Plaintiff is free to reapply for appointment of pro bono counsel with respect to his remaining claims.